UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DWAYNE LEASTON-BROWN,<br><br>        Defendant. | Criminal No. 18-10402-RWZ |

## GOVERNMENT'S OPPOSITION TO MOTION TO SUPPRESS, AND REQUEST TO CANCEL HEARING

The defendant Dwayne Leaston-Brown has moved to suppress the physical evidence (*i.e.*, the firearm and five rounds of ammunition found loaded inside it) recovered by the Boston Police Department after he tripped and fell to the ground, and it fell from his person, as he ran away from a police officer at around 5:30pm on September 8, 2018 in Mattapan Square.  Because the gun fell from the defendant's person in plain view prior to the defendant's stop by police, and its incriminating character was immediately apparent to the officers, the seizure of the gun and ammunition was proper under the plain view doctrine.  Moreover, even if the stop had occurred just prior to the defendant's fall, as the defendant suggests, there was ample reasonable suspicion at that point justifying a stop.  Leaston-Brown's reckless and erratic running through a busy Mattapan Square, holding his hand in his right pocket, handling a silver item in his right hand in a manner consistent with a firearm, returning the item to his pocket upon observing police, refusing to speak to police, ignoring a police officer's command to stop, and reversing direction to run away from a chasing police officer all justified Officer Taylor's reasonable suspicion that criminal activity might be afoot and justified a *Terry* stop.  The defendant's Motion should be denied and the hearing scheduled for June 11 should be cancelled, or marked as non-evidentiary.

# BACKGROUND[1]

Around 5:30pm on Saturday, September 8, 2018, Officer Kimber Taylor was in the Mattapan area in a marked Boston Police Department cruiser, when he observed a black male wearing a red and black hoodie, later identified as Dwayne Leaston-Brown, running up Cummins Highway away from River Street, with his right hand in his hoodie pocket.  Report at 5.  Leaston-Brown continued to look backwards over his left shoulder, and appeared to be in fear.  *Id.*  As he ran, he ran into a customer outside the America's Food Basket at 926 Cummings Highway, then ran through the Food Basket parking lot, exiting onto Fairway Street in the direction of Blue Hill Ave.  *Id.*; Ex. 1 at 1; Ex. 2 at USAO033-34.  Officer Taylor made a U-turn on Cummins Highway and a right onto Fairway Street to follow Leaston-Brown.  Ex. 1 at 1.

While Leaston-Brown was running on Fairway Street, Officer Taylor observed a silver item in his right hand, which Officer Taylor believed to be a firearm based on how Leaston-Brown was holding it.  Ex. 1 at 1.  Leaston-Brown looked back, saw the police car, and placed the item back into his right pocket.  Ex. 1 at 1-2.  Officer Taylor activated his blue lights, pulled up next to Leaston-Brown on Fairway Street by the Santander Bank, and said, "Yo, can I talk to you?"  Ex. 1 at 2; Ex. 2 at USAO027.  Leaston-Brown did not stop, but ran through traffic across Blue Hill Ave. from the inbound side to the outbound side, keeping his right hand inside the right pocket of his hoodie.  Ex. 1 at 2; Ex. 2 at USAO028.

---

[1] Below, the government summarizes the factual background of the events leading to the charges in this case, relying mainly upon the Boston Police Incident report ("Report") that the defendant relies upon and submits with his motion.  The government further submits the Forms 26 of Officer Kimber Taylor (Exhibit 1 hereto) and Leslie Joseph-Greene (Exhibit 2 hereto), which supplement the Report, and which the government expects the officers would testify consistently with, were there an evidentiary hearing in this case.  However, as set out further below, there is no need for an evidentiary hearing as there is no factual dispute.  *United States v. Brown*, 621 F. 3d 48, 57-58 (1st Cir. 2010).

Officer Taylor turned left onto Blue Hill Ave., where he saw Leaston-Brown stumble and fall to the ground in the outbound lanes just past the median, keeping his right hand in his pocket and bracing his fall with his left hand.  Ex. 1 at 2; Ex. 2 at USAO028.  Officer Taylor stopped and exited his cruiser, said, "Boston Police, stop running," and ran after him.  Ex. 1 at 2. Leaston-Brown got up and ran back through the inbound traffic and onto the sidewalk.  *Id.*  As he was running in front of the Santander Bank at 1617 Blue Hill Ave. in Mattapan, he tripped and fell.  *Id.*; Ex. 2 at USAO029.  When Leaston-Brown fell to the ground, a silver and black firearm fell from his person, landing on the ground (pavement) in front of him and to his right. Ex. 1 at 2.  After Leaston-Brown fell, Officer Taylor caught up with him, got on top of him, and tried to prevent him from getting up or reaching for the firearm, but Leaston-Brown continued to struggle with him.  *Id.;* Ex. 2 at USAO029.

Meanwhile, Det. Leslie Joseph-Greene had been in the area, off-duty, riding in a passenger seat of a private vehicle on Blue Hill Ave. inbound near Santander Bank, when he observed Officer Taylor chasing Leaston-Brown.  Ex. 2 at USAO027.  Based on what he observed, Det. Joseph-Greene believed that Leaston-Brown was armed.  Ex. 2 at USAO028.  He saw Officer Taylor get on top of Leaston-Brown, and exited the vehicle he was riding in and ran over to see if he could assist.  Ex. 2 at USAO029.  When he arrived where Officer Taylor and Leaston-Brown were, he saw the firearm on the ground by Leaston-Brown, and saw that Leaston-Brown was still struggling with Officer Taylor and that a crowd was beginning to form. Ex. 2 at USAO030.  Det. Joseph-Greene identified himself to Officer Taylor, picked up the gun so that no one else would, and called for backup using Officer Taylor's radio.  *Id.*

A few minutes later, backup arrived, and Leaston-Brown was transported to BPD District 3 for booking.  Det. Joseph-Greene turned the firearm in to Det. Stephen O'Brien, who rendered

it safe and discovered that it was a KahrArms model CM9, 9mm semi-automatic pistol, with serial number IQ6852.  Report at 6.  He also determined that it had been loaded with a magazine containing six 9mm Luger cartridges.

Meanwhile, Boston Police had received reports of another suspect carrying a gun in the same Mattapan Square area at the same time that Leaston-Brown was arrested.  One bystander told Officer Taylor that he had observed Leaston-Brown and another male pulling guns on each other.  Ex. 1 at 2-3.  While Officer Taylor had been following Leaston-Brown, the other suspect peeled off and discarded a black firearm in a trash bin at the Burger King parking lot.  Officers went to the Burger King parking lot and found a black Glock 43 in the trash bin. Ex. 1 at 3.

Virtually the entire incident is captured on video, which has been produced to the defense.  Significant video surveillance evidence from numerous Mattapan Square businesses -- including from Mattapan House of Pizza, Santander Bank, Dunkin Donuts (directly across Fairway Street from Santander), and America's Food Basket -- captures the chain of events, from the initial confrontation between Leaston-Brown and the other suspect at the Mattapan House of Pizza through the chase and arrest of Leaston-Brown outside Santander Bank.  *See* Ex. 2.

## ARGUMENT

There was no Fourth Amendment violation, and no grounds for suppression, because the defendant was not stopped until *after* Officer Taylor saw the gun fall from his person to the ground in plain view, at which point there was both reasonable suspicion to stop him and probable cause to arrest him under state law.

Although before that time, Officer Taylor had *attempted* to conduct a brief investigatory stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), ordering Leaston-Brown to stop as he weaved through heavy traffic on Blue Hill Avenue on foot, his efforts were unsuccessful and the defendant

4

was not stopped for Fourth Amendment purposes, as Leaston-Brown did not accede to Officer

Taylor's show of authority. *Cal. v. Hodari D.*, 499 U.S. 621, 626 (1991). Rather, as Officer Taylor

reports and surveillance video corroborates, Leaston-Brown tripped of his own accord prior to

Officer Taylor's touching him, and the gun fell to the ground in plain view as he fell. Defendant

does not allege facts suggesting otherwise. Accordingly, the gun and ammunition were properly

seized pursuant to the plain view doctrine, and defendant's motion should be denied without a

hearing. *United States v. Cintron*, 724 F.3d 32, (1st Cir. 2013) ("To obtain an evidentiary hearing

. . . [t]he burden is on the defendant to allege facts, sufficiently definite, specific, detailed, and

nonconjectural, to enable the court to conclude that a substantial claim is presented") (quotations

and citations omitted).

Moreover, even if the stop had occurred just *before* Officer Taylor saw the gun fall to the

ground, as defendant suggests (Motion at 3-4), at that point both a stop and a frisk were justified

under *Terry*. In *Terry,* the Court held:

> where a police officer observes unusual conduct which leads him reasonably to
> conclude in light of his experience that criminal activity may be afoot and that the
> persons with whom he is dealing may be armed and presently dangerous, where in
> the course of investigating this behavior he identifies himself as a policeman and
> makes reasonable inquiries, and where nothing in the initial stages of the encounter
> serves to dispel his reasonable fear for his own or others' safety, he is entitled for
> the protection of himself and others in the area to conduct a carefully limited search
> of the outer clothing of such persons in an attempt to discover weapons which might
> be used to assault him.

392 U.S. at 30. Here, the observation of Leaston-Brown's reckless and erratic running through

Mattapan Square, holding his hand in his right pocket, handling a silver item in his right hand in a

manner consistent with a firearm, returning the item to his pocket upon observing police, refusal

to speak to police, ignoring a police officer's command to stop, and reversing direction to run away

from a chasing police officer all constitute "unusual conduct" which led Officer Taylor reasonably

to conclude that criminal activity might be afoot and Leaston-Brown might be armed and presently

dangerous both to himself and to the many people going about their lawful business in Mattapan

Square that afternoon, justifying a stop.

**I.     The Gun Fell in Plain View Prior to the Stop of Leaston-Brown and Its Seizure Was Justified Under the Plain View Doctrine**

Because the loaded gun fell in plain view of the police prior to Leaston-Brown's stop, the

seizure of the gun and ammunition was valid under the plain view doctrine.   The First Circuit has

held that the plain view doctrine has two requirements: (1) "that the officer did not violate the

Fourth Amendment in arriving at the place from which the evidence could be plainly viewed" and

(2) "that the evidence's incriminating character [was] 'immediately apparent' to the officer."

*United States v. Hamie,* 165 F.3d 80, 82 (1st Cir. 1999) (quoting *Horton v. California,* 496 U.S.

128, 136 (1990)).   Here, both requirements are met.

**A.  Officer Taylor Did Not Violate the Fourth Amendment In Arriving At the Point Where He Saw the Gun Fall In Plain View**

Contrary to the defendant's argument that Officer Taylor unlawfully stopped him prior to

the gun's falling, as a matter of law the defendant was not stopped until after the gun fell to the

ground and Officer Taylor first touched Leaston-Brown – here, by going down to the ground and

grabbing his arms behind him so that he could not reach the gun.

Determining when a person is seized for Fourth Amendment purposes requires close

analysis of the facts.   *United States v. Taylor*, 511 F.3d 87, 92 (1st Cir. 2007) (assessment of

whether a seizure took place is "highly fact-specific and must be performed on a case-by-case

basis").   Here, the initial interaction between Officer Taylor and Leaston-Brown was Officer

Taylor's driving up beside Leaston-Brown and calling out, "Yo, can I talk to you?"  These actions

– typical of interactions that take place on the street every day and are necessary for effective

police work – simply have no Fourth Amendment implications. *United States v. Young*, 105 F.3d 1, 6 (1st Cir. 1997) ("Police may approach citizens in public spaces and ask them questions without triggering the protections of the Fourth Amendment.").

Taylor's calling out to Leaston-Brown in a casual tone does not convert a consensual encounter into a stop. *United States v. Smith*, 423 F.3d 25, 30 (1st Cir. 2005) (no seizure when two officers initially approached defendant in cruiser and then got out and asked questions which resulted in seizure of firearm); *United States v. Sealey*, 30 F.3d 7 (1st Cir. 1994) (no seizure where officer shouted "what's up" and defendant ran); *cf. United States v. Mendenhall*, 446 U.S. 544, 554 (1980) ("a tone of voice indicating that compliance with the officer's request might be compelled" is relevant to whether a casual encounter morphed into a *Terry* stop requiring reasonable suspicion). As the First Circuit noted in *Smith,*

> In *Mendenhall*, the Supreme Court made clear that "characterizing every street encounter between a citizen and the police as a 'seizure,' ... would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices." *Id*. at 554. Without the authority to approach and briefly question a citizen, "those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished. *Id.* (internal citations omitted).
>
> In order to avoid such an unsatisfactory result, the Court has made clear that only when a citizen's freedom of movement is objectively restrained is there any foundation for invoking constitutional safeguards. *Id.* at 553.

423 F.3d at 28.

Similarly, Officer Taylor's exiting his cruiser, calling for Leaston-Brown to stop, and running after Leaston-Brown on Blue Hill Ave., while indicative of a "show of authority," do not constitute a seizure because Leaston-Brown did not stop but rather continued to run away. *See Hodari D., 499 U.S. at 629 (assuming that chasing after a suspect on foot is a show of authority, but finding no seizure because defendant did not yield to the show of authority).

Here, Leaston-Brown's freedom of movement was not "objectively restrained" under *Mendenhall* until after he tripped and fell, and Taylor got down to the ground and grabbed him from behind to try to stop him from reaching for the firearm. *United States v. Belin*, 868 F.3d 43, 48 (1st Cir. 2017) ("we cannot conclude that [officer] had objectively communicated the use of his official authority to restrain Belin until he grabbed Belin's arm").

The Defendant pinpoints the stop as occurring at "the moment during the chase when Officer Taylor made physical contact with Mr. Leaston-Brown *or* when Mr. Leaston-Brown fell, whichever happened first."  Motion at 3-4 (citing *Hodari D.,* 499 U.S. at 625, for the proposition that "seizure occurs upon 'slightest application of physical force' or upon submission by the arrestee to a show of authority").  *Hodari D.* does not stand for the proposition that when an individual trips while running away from police that he has submitted to a show of authority, and the defendant does not cite any other authority for such a proposition.  Rather, in *Hodari D.*, the defendant ran away from police, police gave chase, and the defendant tossed a rock of crack cocaine.  499 U.S. at 623.  The officer then tackled the defendant and handcuffed him.  The Court held that the show of authority, including a command to stop, does not rise to the level of a seizure unless the individual actually submits to the show of authority.   *Id.* at 626 ("[The word seizure] does not remotely apply . . . to the prospect of a policeman yelling, 'Stop, in the name of the law!' at a fleeing form that continues to flee.  That is no seizure.").  Thus, the Court held that the defendant was not seized until the moment the police officer tackled him – the first moment that he touched him.  *Id.*  Similarly here, Leaston-Brown was not seized until Officer Taylor got on top of him and grabbed his arms from behind.

Thus, Officer Taylor was lawfully present in front of the Santander Bank when he observed the gun fall from Leaston-Brown's person, and he had not committed a Fourth Amendment violation to arrive there.

### B.   The Gun's Incriminating Character Was Immediately Apparent Under State Law

The gun's incriminating character was immediately apparent to the officer under state law. In Massachusetts, both publicly carrying a firearm and possessing a firearm are presumed unlawful unless the defendant produces evidence of a proper license to carry.   A license is an affirmative defense; the absence of such a license is not an element of the crime.   *See* M.G.L. c. 269, § 10(a)(1), (2), (h)(1); *Commonwealth v. Jones*, 361 N.E. 2d 1308, 1311 (Mass. 1977); *Powell v. Tompkins*, 783 F.3d 332 (1st Cir. 2015) (affirming denial of habeas due process challenge to Massachusetts law on this point).

Accordingly, at the moment the officer saw the gun fall from Leaston-Brown, he was authorized under the plain view doctrine to seize the gun, and also had probable cause to arrest Leaston-Brown for a state firearms violation.   There was no Fourth Amendment violation.

### II.      Officer Taylor Had Reasonable Suspicion For a Stop Before the Gun Fell

Even if the stop could be construed as occurring prior to the time Officer Taylor saw the gun fall to the ground and prior to Officer Taylor's grabbing Leaston-Brown from behind on the ground, there was more than ample reasonable suspicion to stop Leaston-Brown by the time Officer Taylor got out of his car in the Blue Hill Avenue outbound lane and started chasing Leaston-Brown on foot – well before even the defendant argues the stop occurred.

Because of the limited nature of *Terry* stops and their critical importance to effective law enforcement, *Terry* requires only a showing that the police have some reasonable suspicion of criminal activity. *Id.* at 28.   This does not require probable cause, *United States v. McCarthy*, 77

F.3d 522, 529 (1st Cir. 1996), that the defendant's involvement in criminal activity be proven by a preponderance of the evidence, *see Alabama v. White*, 496 U.S. 325, 329-30 (1990), that there be "evidence of a direct connection linking the suspect to the suspected crime," *United States v. Chhien*, 266 F.3d 1, 6 (1st Cir. 2001), or even that the officer's observations were "correct." *Brown*, 621 F.3d at 57.   The government must simply point to "specific and articulable facts" that would reasonably warrant an officer's making the intrusion.   *E.g., Young*, 105 F.3d at 6.

The determination of reasonable suspicion requires consideration of the "totality of the circumstances" collectively known to the police.   *United States v. Romain*, 393 F.3d 63, 71 (1st Cir. 2004).   Individual circumstances "are not to be dissected and viewed singly; rather they must be considered as a whole." *United States v. Trullo*, 809 F.2d 108, 111 (1st Cir. 1987); *see United States v. Pontoo*, 666 F.3d 20, 29 (1st Cir. 2011) (court must "take care not to evaluate facts in splendid isolation" but "appraise [them] in the context in which they occurred")*; United States v. Ruidiaz*, 529 F.3d 25, 29 (1st Cir. 2008) ("reasonableness requires a practical, common sense determination, a determination that entails a measurable degree of deference to the perceptions of experienced law enforcement officers").   "A fact that is innocuous in itself may, in combination with other innocuous facts, take on added significance," which may culminate in reasonable suspicion.   *United States v. Wright*, 582 F.3d 199, 212-213 (1st Cir. 2009) (quoting *Ruidiaz*, 529 F.3d at 30).   Hence, arguments that attempt to isolate individual factors and then assert that suppression is required because no factor by itself justified the decision to stop must fail.

Application of these principles here demonstrates that Officer Taylor had reasonable suspicion to stop Leaston-Brown even as of the time he exited his cruiser, on the basis of the following facts that were known to him at the time, and which are undisputed:

1. Late one Saturday afternoon in September, as everyone else in Mattapan Square went about their ordinary business, Leaston-Brown ran down the street, looking backwards as

if in fear, with his right hand in his hoodie pocket, with such haste that he collided with a customer outside a supermarket.

2. After colliding with the customer, Leaston-Brown continued running, cutting through the supermarket parking lot, still holding his right hoodie pocket.

3. As Leaston-Brown ran, Officer Taylor at one point saw a silver object in Leaston-Brown's right hand, which, based on the way he held it, Officer Taylor believed to be a firearm.

4. After looking back and noticing a Boston Police cruiser behind him, Leaston-Brown placed the silver object back into his right hoodie pocket.

5. Leaston-Brown ignored Officer Taylor's activation of his lights and his "Yo, can I talk to you?" invitation, and instead kept running away from the Officer, keeping his right hand in his right hoodie pocket

6. Leaston-Brown ran recklessly and erratically, weaving through heavy traffic on Blue Hill Avenue inbound, tripping near the median as he entered the outbound traffic lanes.

7. Leaston-Brown ignored Officer Taylor's command to stop, instead reversing direction and weaving back through heavy traffic inbound to get away from him.

Based on these factors, Officer Taylor had reasonable suspicion that criminal activity was afoot, and that Leaston-Brown was armed and dangerous, justifying a stop.

### a. Leaston-Brown's Nervous Flight, Looking Backwards, and Collision with Bystander

Officer Taylor's observations of Leaston-Brown's running down the street nervously, looking backwards as if in fear as he ran, and running so recklessly that he collided with an individual standing outside of a grocery store – though not alone enough to amount to reasonable suspicion of criminal activity – reasonably drew Officer Taylor's attention, and began a suspicion that criminal activity was afoot and there was a safety risk to the community. *See Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) ("the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior"). Leaston-Brown's behavior was

particularly concerning where, as video surveillance demonstrates, there were children present as Leaston-Brown ran erratically through the streets of Mattapan Square. *See* Ex. 2 at USAO035-36.

### b. Leaston-Brown's Running with His Right Hand in His Pocket; Officer Taylor's Glimpse of a Silver Object Held Like a Firearm in His Hand

Officer Taylor's observations of Leaston-Brown's running while keeping his right hand in his right pocket, holding a silver object in his right hand *in a manner suggesting to Officer Taylor that it was a firearm*, returning the object to his right pocket upon seeing police, and continuing to run holding his hand in that pocket, powerfully support his determination of reasonable suspicion to stop Leaston-Brown. Based on his training in the characteristics of armed persons, and his experience, Officer Taylor interpreted those movements as an indication that Leaston-Brown may be carrying an unholstered firearm in his pocket. *See United States v. Dubose*, 517 F.3d 119, 122 (1st Cir. 2009) (reasonable suspicion determination upheld based in part on testimony that individuals "often carry weapons concealed in their waistbands, and, because that is not a very secure position for a gun, they often keep their hands in their pockets to ensure the gun does not fall down"); *United States v. Hart*, 674 F.3d 33, 39 (1st Cir. 2012) (upholding reasonable suspicion where, among other things, defendant stepped quickly away from police, and "his hand never left his waistband"). Moreover, his attempts to conceal the item from police contributed to reasonable suspicion that what he carried was unlawful. *See Hart,* 674 F.3d at 39.

Although defendant correctly points out that the First Circuit in *Wright* found that it was error to infer on the facts of that case that an individual's clutching his pocket supported the inference that his pocket contained a weapon as opposed to other contraband (Motion at 4), this case is distinguishable because here the officer not only saw clutching of the right pocket, but also at one point saw the defendant holding the silver object in his right hand in a manner consistent with a firearm. Moreover, the court in *Wright* also noted that a *Terry* stop is justified even if "the

conduct justifying the stop is ambiguous and susceptible of an innocent explanation" because "the very purpose of [*Terry*] stops is to clarify ambiguous situations." 582 F.3d at 231 (internal citations omitted). Moreover, here, under the totality of the circumstances, there was ample reason beyond Leaston-Brown's holding his right hand in his pocket continuously for Officer Taylor to suspect that the item in Leaston-Brown's waistband was a gun – as indeed it turned out to be.

### c.  Leaston-Brown's Efforts at Concealment and Avoidance of Police

Here, Leaston-Brown's increasing efforts at concealment from and avoidance of police – from hiding the object in his hand upon seeing police, to ignoring Officer Taylor's "Yo, can I talk to you?" call out, to ignoring Officer Taylor's subsequent command to stop, and to ultimately reversing direction to run away from Officer Taylor – powerfully contribute to reasonable suspicion.

The First Circuit has acknowledged that an individual's painstaking concealment of an object from police view "signaled that what he carried was unlawful" and contributes to a police officer's reasonable suspicion of criminal conduct. *Hart*, 674 F.3d at 39. Thus, Leaston-Brown's concealment of the object after he noticed police presence contributes to reasonable suspicion. His refusal thereafter to heed the police officer's invitation to speak – while not "without more" [2] sufficient to justify a *Terry* stop, *Florida v. Bostick*, 501 U.S. 429, 437 (1991) – serves as one more data point Officer Taylor could consider in assessing the situation.

Much more significantly, after Officer Taylor activated his lights, turned onto Blue Hill Avenue, got out of his car, and shouted, "Boston Police, stop running," Leaston-Brown *reversed*

---

[2] Defendant cites to *Gunter v. Cicero*, 364 F.Supp. 3d 124, 134-135 (D. Mass. March 11, 2019) and the cases cited therein for the proposition that "Mr. Leaston-Brown's decision not to accept that invitation does not permit an inference of criminal activity" (Motion at 6), but does not acknowledge the "without more" caveat. *See* Motion at 6.

*direction*, and ran in the opposite direction, weaving back through traffic to get away from the officer. Although Leaston-Brown had been running prior to Officer Taylor's following him, his refusal to obey the order to stop, and reversing direction to get away from Officer Taylor, was reasonably perceived by Officer Taylor as flight from police.[3] A suspect's "refusal to obey the officers' order to stop, without a doubt, contributes to reasonable suspicion." *Wright,* 582 F.3d at 212. Additionally, the Supreme Court has held that "unprovoked flight upon noticing the police" contributes to reasonable suspicion. *Wardlow*, 528 U.S. at 124 ("nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"; "[h]eadlong flight -- wherever it occurs -- is the consummate act of evasion: [i]t is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."); *see also Hodari D.*, 499 U.S. at 623 n. 1 ("That it would be unreasonable to stop, for brief inquiry, young men who scatter in panic upon the mere sighting of the police is not self-evident, and arguably contradicts proverbial common sense."). Here, Leaston-Brown's running away from Officer Taylor, to the extent that he reversed direction and weaved through traffic to get away from him, was reasonably interpreted by him as flight and hence contributed to his reasonable suspicion. *See United States v. Aitoro*, 446 F.3d 246, 253 (1st Cir. 2006) ("what is relevant is not whether [defendant] actually perceived the officers as police officers, but whether the officers reacted reasonably on seeing him flee"); *Perry v. Bordley*, 379 F.Supp.2d 109, 115 (D. Mass. 2005) (even if bicyclist's actions were innocent, it could have appeared to a reasonable officer as an attempt at flight).

---

[3] The surveillance video demonstrates that Leaston-Brown also briefly reversed course earlier, while running along Fairway Street, but then upon seeing the police cruiser coming up with lights activated turned around and continued towards Blue Hill Ave. This debunks the defendant's argument that it is possible he did not see the blue lights activated behind him (Motion at 6).

Notably, it was not just Officer Taylor who found Leaston-Brown's behavior suspicious. Officer Joseph-Greene, who had only seen the portion of the interaction at the intersection of Fairway and Blue Hill Avenue, independently suspected based on his own observations that Leaston-Brown was carrying a firearm, confirming the objective reasonableness of Officer Taylor's suspicion. *See Hart*, 674 F.3d at 38 (the standard is "objective, such that a reasonable officer in similar circumstances also would harbor suspicion").

Accordingly, even if Leaston-Brown was stopped before the gun fell from his pocket, the stop was amply supported by reasonable suspicion.

## III.    There Is No Need for an Evidentiary Hearing

A decision whether to conduct evidentiary hearing is in the "sound discretion of the district court." *Brown*, 621 F. 3d at 57.  To obtain such a hearing, the "defendant must show that there are factual disputes which, if resolved in his favor, would entitle him to the requested relief." *Id.* at 57-58 (quoting *United States v. Staula,* 80 F.3d 596, 603 (1ˢᵗ Cir. 1996).  *See also Cintron*, 724 F.3d at 36 (1st Cir. 2013) ("To obtain an evidentiary hearing, a defendant challenging a warrantless search must make a sufficient threshold showing that no exception to the warrant requirement applied to the search. The burden is on the defendant to allege facts, sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented.") (citations and internal quotations omitted); *United States v. Calderon*, 77 F.3d 6, 9 (1st Cir. 1996) (upholding refusal to grant evidentiary hearing on motion to suppress where defendant did not describe the circumstances supporting his assertion, made no proffer of proof relative to any other facts that might support his assertion, and where government provided competent evidence to support the district court's finding); *United States v. Smith*, 2013 WL 6072876, No. 13-10064-NMG (D. Mass. 2013) (denying defendant's motion for evidentiary hearing on motion to suppress

15

where defendant relied "on police reports and other government-produced materials for his submissions and motion" and contested that those facts justified stop rather than contesting the material facts themselves).

Here, the defendant has not submitted an affidavit alleging any facts whatsoever, and his Motion does not raise any material factual disputes, so an evidentiary hearing is unnecessary, and it is proper for this Court to deny the Motion to Suppress without an evidentiary hearing. *See United States v. Lewis,* 40 F.3d 1325, 1332 (1st Cir. 1994) (defendants not entitled to evidentiary hearing where the facts were essentially uncontested and neither defendant submitted an affidavit alleging facts indicating that the officer's discovery of contraband violated the Fourth Amendment). Accordingly, the government requests that the hearing scheduled for June 11 be cancelled, or marked as non-evidentiary.

## CONCLUSION

Because the gun and ammunition were lawfully seized pursuant to the plain view doctrine, and because the stop was justified by reasonable suspicion, the defendant's Motion to Suppress should be denied without an evidentiary hearing.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

*/s/ Elianna J. Nuzum*
Elianna J. Nuzum
Assistant United States Attorney
John Joseph Moakley U.S. Courthouse
One Courthouse Way, Suite 9200
Boston, MA 02210
elianna.nuzum@usdoj.gov
617.748.3100

Dated: June 3, 2019

16

## <u>CERTIFICATE OF SERVICE</u>

 Undersigned counsel certifies that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Elianna J. Nuzum*   
Elianna J. Nuzum
Assistant United States Attorney

Dated: June 3, 2019