UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 18-10402-RWZ

UNITED STATES OF AMERICA

v.

DWAYNE LEASTON-BROWN

ORDER

June 28, 2019

ZOBEL, S.D.J.

Defendant Dwayne Leaston-Brown ("Leaston-Brown") is charged in one count with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). He has moved to suppress the firearm and ammunition that was recovered during a police stop on September 8, 2018. After an evidentiary hearing, at which Boston Police Officer Kimber Taylor and Boston Police Detective Leslie Joseph-Greene testified and the government offered several exhibits, I find the following facts.

I. **Findings of Fact**

In the late afternoon of September 8, 2018, Officer Taylor (hereafter "Taylor") was driving outbound on Cummins Highway across from the American Food Basket supermarket in the Mattapan Square area.[1] He observed a black male, later identified as defendant, Dwayne Leaston-Brown (hereafter "Leaston-Brown" or "defendant"), run up River Street, take a left on Cummins Highway and continue running inbound towards

---

[1] See Government Exhibit 1, attached hereto, which depicts the Mattapan Square area where these events transpired.

him. As he was running, Leaston-Brown kept his hand in his sweatshirt pocket and looked back over his shoulder. He appeared to be in fear.[2] Taylor became concerned that defendant had a gun in his pocket. As defendant ran past the entrance to America's Food Basket, he knocked into a pedestrian[3] before turning right and bolting across the supermarket parking lot towards Fairway Street. At this point, Taylor shifted his car into reverse, made a u-turn and followed the defendant onto Fairway Street. As he approached Leaston-Brown, Taylor observed a silver item in his hand. When he turned on his cruiser lights, he noticed Leaston-Brown look back at the cruiser and put his hand back in his pocket. Taylor pulled up next to him and called out "Yo, can I talk to you?" While he was stopped next to defendant, Taylor again noticed the silver object. Leaston-Brown ignored Taylor's request to talk, and instead continued running up Fairway Street, rounded the corner and cut across Blue Hill Avenue, which was at that time busy with stop-and-go traffic.

Taylor followed defendant in his cruiser, continuing straight on Fairway and then turned left on Blue Hill Avenue. Defendant crossed the Blue Hill Avenue median and tripped, bracing his fall with his hand. At this point, Taylor stopped, got out of his cruiser and commanded "Boston Police, stop running!" Defendant continued to run, and reversed course, <u>back</u> across Blue Hill Avenue toward Santander Bank. Taylor gave chase and caught up to defendant right outside the bank. As Taylor approached,

---

[2] <u>See also</u> Docket # 38-1 (Taylor's original incident report) ("The male continued to look back appear [sic] to be in fear).

[3] Taylor thought Leaston-Brown ran into a woman, but video footage reveals it was in fact a man. Although Taylor's testimony was also not entirely clear as to which hand Leaston-Brown used to secure his pocket as he was running, viewed in its entirety I find it to be credible.

2

defendant tripped and fell again, at which point, according to his testimony, Taylor saw, and heard, a firearm fall to the ground. He then put his hands on defendant's back and tried to drag him away from the loose firearm. Video footage is inconclusive about the precise sequence of these events, i.e., whether the gun dislodged before or after Taylor made physical contact.

While these events transpired, an off-duty Boston Police Detective, Leslie Joseph-Greene (hereafter "Joseph-Greene"), was in the area by happenstance, a passenger in a car stopped at a traffic light on the outbound side of Blue Hill Avenue outside Santander Bank. He observed defendant run around the corner clutching his side, cross Blue Hill Avenue and trip over the median, and saw Taylor's cruiser turn left on Blue Hill Avenue and pull up beside defendant. Joseph-Greene stated that he, too, believed that defendant may be carrying a gun, and asked the driver to pull over after crossing through the intersection. Craning his neck to watch, Joseph-Greene explained that he saw defendant run back across Blue Hill Avenue with Taylor in pursuit on foot. He observed defendant stumble a second time and Taylor tackle him. At this point, Joseph-Greene left his car and ran over to help Taylor. As he approached, he saw a gun on the sidewalk next to defendant's right side. After identifying himself to Taylor, Joseph-Greene picked up the firearm, pointed it downward, and secured it while Taylor subdued defendant.

II.    **Legal Standard**

Because Taylor did not obtain a warrant prior to his confrontation with defendant, the government bears the burden of establishing that its search and seizure falls within an exception to the Fourth Amendment search warrant requirement. E.g., United

3

States v. Vargas, 86 F. Supp. 3d 38, 42 (D. Mass. 2015). Two such exceptions are relevant here: the plain view and the stop and frisk doctrines. "[T]he plain view doctrine permits the warrantless seizure of an item if the officer is lawfully present in a position from which the item is clearly visible, there is probable cause to seize the item, and the officer has a lawful right of access to the item itself." United States v. Gamache, 792 F.3d 194, 199 (1st Cir. 2015). Under the stop and frisk exception, outlined by Terry v. Ohio, 392 U.S. 1 (1968), and its progeny, an officer may conduct a brief investigatory stop without a warrant so long as the officer knows "articulable facts giving rise to a reasonable suspicion that a suspect may be involved in criminal activity." Morelli v. Webster, 552 F.3d 12, 19-20 (1st Cir. 2009). A seizure occurs, and reasonable suspicion is required, only if the officer applies physical force or the defendant submits to the officer's assertion of authority. California v. Hodari D., 499 U.S. 621, 626 (1991).

## III. Conclusions of Law

The government argues the plain view doctrine dictates the result here: before Taylor laid hands on him, Leaston-Brown tripped of his own accord and the firearm fell to the ground in plain sight. Thus, at the time the stop occurred, the firearm was in plain view and its seizure was lawful.

The stop did not occur until Taylor made physical contact with Leaston-Brown. Though Taylor attempted to make a stop earlier—by asking to speak with defendant and then directing him to stop running—defendant did not heed Taylor's requests, and thus did not submit to his authority, until Taylor made physical contact outside Santander Bank. See Hodari D., 499 U.S. at 626 ("The word 'seizure'...does not remotely apply, however, to the prospect of a policeman yelling 'Stop, in the name of

4

the law!' at a fleeing form that continues to flee.").

Yet, the evidence surrounding the ejection of the firearm is not conclusive. Taylor did testify that he saw and heard the firearm fall to the ground before he touched the defendant. But the surveillance video admits of the opposite: the first time the viewer can make out the gun, it is sitting right next to Leaston-Brown while Taylor is on top of him. Because the evidence permits the equally plausible conclusion that Taylor displaced the firearm when he made physical contact with the defendant, the plain view doctrine does not avail the government.

However, even if Taylor caused the gun to fall out of Leaston-Brown's pocket, reasonable suspicion had developed well before that point such that the seizure was within the bounds of the stop and frisk exception. In making this assessment, "the critical inquiry is whether reasonable suspicion arose under the totality of the circumstances." United States v. Andrade, 551 F.3d 103, 110 (1st Cir. 2008). This inquiry "requires a practical, commonsense determination" that "entails a measurable degree of deference to the perceptions of experienced law enforcement officers." United States v. Ruidíaz, 529 F.3d 25, 29 (1st Cir. 2008). Here, the entirety of the evidence was more than sufficient to generate a reasonable and articulable basis for stopping Leaston-Brown. When Taylor first noticed defendant, he was running up the street, looking over his shoulder and clutching his side with a look of fear on his face. He kept running, even when Taylor pulled up beside him and asked to talk, and later implored him to stop running. He ran erratically, crashing into a supermarket patron, darting across stop-and-go traffic and tripping and falling more than once. These facts

5

and Taylor's further observation of a silver object peeking out of defendant's pocket, fully support his reasonable suspicion that defendant was concealing a firearm.

The First Circuit addressed a similar fact pattern in United States v. Wright, 582 F.3d 199 (1st Cir. 2009). There the defendant, upon noticing an undercover police car next to him, left his car and began to run down the street while clutching his sweatshirt in the vicinity of his waist. The police ordered him to stop running, but defendant did not comply. Eventually they caught up with him, patted him down, and recovered a pistol from his sweatshirt pocket. The court affirmed the finding of reasonable suspicion, holding that "each event recast each previous event in a different light, such that, by the time that Wright refused to stop, there was sufficient suspicion to question why he had leaned forward, exited the car, clutched, and started running." Id. at 213.

So too in Leaston-Brown's case—although no one detail viewed in isolation would raise sufficient assurance to justify a stop, taken together they establish reasonable suspicion, at the very least, by the time that Leaston-Brown fled from Taylor's command to stop running. See also United States v. Sokolow, 490 U.S. 1, 9 (1989) ("Any one of these factors is not by itself proof of any illegal conduct . . . . [b]ut we think taken together they amount to reasonable suspicion."); Terry, 392 U.S. at 22-23 (basing reasonable suspicion on "a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation").

## IV. Conclusion

Because Taylor's stop was supported by reasonable suspicion, the warrantless seizure of the firearm was lawful. Accordingly, defendant's motion to suppress (Docket # 38) is DENIED.

June 28, 2019
DATE

RYA W. ZOBEL
SENIOR UNITED STATES DISTRICT JUDGE

6

